| | | |
|---|---|---|
| MARIA C. LEE, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | EP-16-CV-00034-DCG |
| | § | |
| MISSION CHEVROLET, LTD., and | § | |
| JERRY SLAUGHTER, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Presently before the Court are Defendant Mission Chevrolet, Ltd.'s ("Defendant" or "Mission") "Motion for Summary Judgment" (ECF No. 16) and Plaintiff Maria C. Lee's ("Plaintiff" or "Lee") "Motion for Partial Summary Judgment and Memorandum in Support" (ECF No. 15). In this lawsuit, Lee asserts claims for discrimination, retaliation, and hostile work environment in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. The parties' initial briefing raised, but did not fully address, multiple issues of first impression—on which the Fifth Circuit has not spoken yet. The Court therefore requested, and the parties submitted, supplemental briefs on those issues. Having carefully considered the parties' arguments and the evidence in the record, the Court, for the reasons that follow, GRANTS IN PART and DENIES IN PART Mission's motion and DENIES Lee's motion.

## I. BACKGROUND

### A. Factual Background

Unless otherwise stated, the following facts are undisputed.[1] Mission is a car dealership in El Paso, Texas. Jerry Slaughter ("Slaughter") is Mission's general manager and oversees its

---

[1] Resp. to Def.'s Undisputed Facts, ECF No. 23-1; Resp. to Pl.'s Undisputed Facts, ECF No. 24-1.

entire operations. In April 2009, Mission hired Lee (then, Maria Morales) as a salesperson for selling new and used cars. After working at Mission for about three and a half years, she resigned in October 2012 so that she could move to Odessa, Texas, with her then boyfriend. In May 2013, Lee returned to El Paso and re-applied for employment with Mission. Slaughter authorized her re-hire, and she again started as a salesperson. In October or November 2013, she was promoted to a management position.

Around this time, she started a romantic relationship with Jimmy Lee ("Jimmy"), a finance director at Mission. In January 2014, Lee and Jimmy informed Slaughter about their relationship. The parties dispute the reason why Lee and Jimmy disclosed their relationship to him: according to Lee and Jimmy, they did so in hopes of stopping Slaughter's sexual harassment against Lee. On March 6, 2014, Lee resigned. The parties dispute the circumstances leading up to her resignation: according to Mission, she voluntarily resigned, but according to Lee, Slaughter forced her to resign by giving her a false choice between resignation and termination.

On December 16, 2014, Lee filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging sex, race, and national origin discrimination and retaliation in violation of Title VII. On May 28, 2015, the EEOC issued a right to sue letter under Title VII, and on June 22, 2015, Texas Workforce Commission, Civil Rights Division, issued a right to sue letter under the Texas Commission on Human Rights Act ("TCHRA"), codified in Chapter 21 of the Texas Labor Code.

**B. Procedural History**

On August 21, 2015, Lee sued Mission and Slaughter by filing an "Original Petition" in the County Court at Law No. 3, El Paso County, Texas. In that petition, she asserted claims for

sex, race, and national origin discrimination and retaliation in violation of the TCHRA against Mission and common law claims for assault and battery against Slaughter.[2] On September 14, 2015, Mission and Slaughter filed their "Original Answer." The next day, they filed a "First Amended Answer," adding an affirmative defense based on Lee's failure to timely file her charge of discrimination within 180 days of the alleged discriminatory acts as required under the TCHRA. The following day, on the same basis, they filed a plea to the jurisdiction, claiming that the state court lacked subject matter jurisdiction over her TCHRA claims.

On January 25, 2016, Lee filed her "First Amended Petition."[3] Therein, she added claims for race discrimination and retaliation in violation of 42 U.S.C. § 1981; otherwise, the Original Petition and the First Amended Petition were identical. On January 29, 2016, Mission and Slaughter removed the case to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331, premised upon Lee's § 1981 claims.

Upon removal, on February 25, 2106, Lee moved for leave to amend her pleading to add claims under Title VII; Mission did not oppose. The Court granted the motion, and her "Second Amended Petition" (ECF No. 4) (hereinafter "Second Amended Complaint") was docketed on February 29. In that pleading, Lee dropped her TCHRA claims, but retained her § 1981 claim for race discrimination and common law claims for assault and battery; moreover, for the first time, she added claims for discrimination, retaliation, and hostile work environment based on sex, race, and national origin in violation of Title VII. Mission and Slaughter filed their "Answer to the Second Amended Complaint" (ECF No. 4) on March 3.

---

[2] Notice of Removal, Ex. A at 4–5, ECF No. 1-1.

[3] *Id.*, Ex. A. at 49.

On November 18 and 19, 2016, Lee and Mission respectively filed the instant motions.[4] The parties' initial briefing on the motions was completed by December 19, 2016.[5] On July 20, 2017, the Court issued an order requiring the parties to brief certain issues. In response, the parties submitted supplemental briefs and responses thereto by August 11, 2017.[6]

## II. STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it 'might affect the outcome of the suit.'" *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))). In deciding whether a genuine dispute as to material fact exists, a trial court considers all of the evidence in the record and "draw[s] all reasonable inferences in favor of the nonmoving party," but "refrain[s] from making credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation and internal quotation marks omitted). Instead, the court "only 'give[s] credence to the evidence favoring the nonmovant [and] that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)

---

[4] *See* Pl.'s Mot. for Partial Summ. Judgment & Mem. in Support [hereinafter Pl.'s MSJ], ECF No. 15; Def. Mission's Mot. for Summ. Judgment [hereinafter Def.'s MSJ], ECF No. 16.

[5] *See* "[Mission's] Response to Plaintiff's Motion for Partial Summary Judgment" [hereinafter Resp. to Pl.'s MSJ], ECF No. 24; "[Lee's] Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment" [hereinafter Reply to Pl.'s MSJ], ECF No. 27; "[Lee's] Response to Defendant's Motion for Summary Judgment" [hereinafter Resp. to Def.'s MSJ], ECF No. 23; "[Mission's] Reply to Plaintiff's Response to Motion for Summary Judgment" [hereinafter Reply to Def.'s MSJ], ECF No. 26.

[6] Pl.'s Suppl. Br., ECF No. 51; Resp. to Pl.'s Suppl. Br., ECF No. 54; Def.'s Suppl. Br., ECF No. 52; Resp. to Suppl. Br., ECF No. 53.

(second alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

Procedurally, the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (alterations in original) (quotation marks and citation omitted). When the nonmoving party will bear the burden of proof at trial, the moving party may satisfy this responsibility by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990); *see also Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544–45 (5th Cir. 2005).

If the moving party succeeds, "the onus shifts to the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *LHC Grp.*, 773 F.3d at 694 (internal quotation marks and citation omitted). However, the nonmoving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Davis v. Fort Bend Cty.*, 765 F.3d 480, 497 n.20 (5th Cir. 2014) (quotation marks and citation omitted).

### III.  DISCUSSION

By its motion, Mission moves for summary judgment on all of Lee's Title VII claims on the ground that she failed to assert them within the 90-day statutory limitations period. It also moves for summary judgment on Lee's Title VII claims for hostile work environment on the ground that the underlying allegations occurred outside the 300-day charge filing period. Lee, on

the other hand, moves for summary judgment on her Title VII claims for retaliation and hostile work environment sexual harassment. Finally, Mission moves for summary judgment on Lee's Title VII claims for retaliation and gender, race, and national origin discrimination, and § 1981 claim for race discrimination. Below, the Court addresses each ground in turn.

## A. The Timeliness of the Title VII Claims and the Relation Back Doctrine

Mission asks the Court to dismiss Lee's Title VII claims because she failed to timely assert them within the 90-day statutory limitations period. A Title VII plaintiff alleging employment discrimination "must file a civil action no more than ninety days after she receives statutory notice of her right to sue from the EEOC." *Duron v. Albertson's LLC*, 560 F.3d 288, 290 (5th Cir. 2009) (*per curiam*) (citing 42 U.S.C. § 2000e-5(f)(1)); *see also Harris v. Boyd Tunica, Inc.*, 628 F.3d 237, 239 (5th Cir. 2010) ("The ninety-day filing requirement is not a jurisdictional prerequisite, but more akin to a statute of limitations."). The EEOC issued the right to sue letter on May 28, 2015, but Lee, for the first time, asserted the Title VII claims in her Second Amended Complaint filed before this Court in February 2016.

Lee responds that pursuant to Federal Rule of Civil Procedure 15(c)(1)(B), the Title VII claims relate back to her Original Petition filed in the state court. Under Rule 15(c)'s relation back doctrine, "[a]n amendment to a pleading relates back to the date of the original pleading when[] . . . the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Rule 15(c) "allows amendments otherwise time-barred to 'relate back' to the date of the original pleading." *F.D.I.C. v. Bennett*, 898 F.2d 477, 479 (5th Cir. 1990); *see also F.D.I.C. v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994) ("The theory that animates this rule is that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the

protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading.") (internal quotation marks and citation omitted).

Lee argues, and Mission does not dispute, that her Title VII claims arise out of the conduct, transaction, or occurrence set out in the Original Petition.[7] As such, Lee maintains, under Rule 15(c)(1)(B), these claims relate back to the filing date of the Original Petition—*i.e.*, August 21, 2015, which was ten days before the 90-day period expired on August 31, 2015[8]— and therefore, are timely.

Not so, responds Mission. It concedes, as it must, that Rule 15(c)(1)(B) applies here because the Second Amended Complaint was filed before this Court.[9] *See Taylor v. Bailey Tool & Mfg. Co.*, 744 F.3d 944, 946 (5th Cir. 2014) ("The Federal Rules of Civil Procedure . . . 'apply to a civil action *after* it is removed from a state court,'" (emphasis in original) (quoting Fed. R. Civ. P. 81(c)); *compare Hensgens v. Deere & Co.*, 869 F.2d 879, 880 (5th Cir. 1989) (stating "federal law regarding relation back of amendments to pleadings is controlling," where the amended petition was filed after removal to federal court), *with Taylor*, 744 F.3d at 946–47 (holding state relation back rule applies to determine whether an amended petition filed in state court relates back to the date of the original petition). Mission, however, claims that the Second Amended Complaint can only relate back to the First Amended Petition filed in state court—not

---

[7] Reps. to Def.'s MSJ at 6.

[8] Assuming that the EEOC mailed the right to sue letter on May 28, 2015, *see* Second Am. Compl., Ex. A, ECF No. 4, and further assuming that the mailbox rule applies, *see Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 267 (5th Cir. 2015) ("[W]here the date of receipt is not known, courts should apply a presumption that the plaintiff received the [the right to sue letter] in three days[]" after mailing.), Lee had ninety-three days therefrom to file a lawsuit asserting her Title VII claims—*i.e.*, until August 29, 2015. However, because August 29 was a Saturday, Lee had until August 31, 2015, a Monday, to do so.

[9] Def.'s MSJ at 5–6; Reply to Def.'s MSJ at 2.

to the Original Petition.[10] Because the 90-day period had also expired when Lee filed the First Amended Complaint, her Title VII claims are untimely.[11] In support of that claim, Mission advances two arguments: (1) her TCHRA claims asserted in the Original Petition were jurisdictionally defective and (2) her § 1981 claims added in the First Amended Petition did not relate back to the TCHRA claims.

To the first argument, Mission explains that Lee was three months too late in pursuing administrative remedies under the TCHRA, which required her to file a charge of discrimination within 180 days after her resignation.[12] Consequently, Mission contends, the state court lacked subject matter jurisdiction over the TCHRA claims on the day the Original Petition was filed. (Later, Mission also characterizes these claims as time-barred.[13]). Mission posits that because an amended claim cannot, under Rule 15(c), relate back to a jurisdictionally defective claim (a

---

[10] Def.'s MSJ at 9.

[11] *Id.*

[12] Def.'s MSJ at 6–8. The TCHRA requires that a person claiming to be injured by an unlawful employment practice file a complaint with the Texas Workforce Commission or the EEOC "not later than the 180th day after the date an allegedly unlawful employment practice occurs." *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 503 (Tex. 2012) (citing Tex. Lab. Code Ann. § 21.202). The 180-day deadline expired on September 2, 2014—*i.e.*, 180 days from March 6, 2014, when she resigned—but Lee filed her EEOC charge of discrimination on December 16, 2014. Def.'s MSJ at 7.

[13] In *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483 (Tex. 1991), the Texas Supreme Court held that "pursuing administrative remedies is a mandatory prerequisite to filing a civil suit and that the failure to do so 'creates a *jurisdictional bar* to [an employment] discrimination claim.'" *Reid v. SSB Holdings, Inc.*, 506 S.W.3d 140, 143–44 (Tex. App.—Texarkana 2016, pet filed) (emphasis added) (quoting *Schroeder*, 813 S.W.2d at 488, *overruled on other grounds by In re United Servs. Auto. Ass'n*, 307 S.W.3d 299 (Tex. 2010)).

However, "[i]t is unclear whether, under Texas law, exhaustion of administrative remedies is still treated as 'jurisdictional.'" *Black v. Dallas Cty. Cmty. Coll. Dist.*, 3:15-CV-3761-D, 2017 WL 395695, at *4 n.7 (N.D. Tex. Jan. 30, 2017) (collecting cases); *see also e.g.*, *Reid*, 506 S.W.3d at 147 (noting that while the Texas Supreme Court has yet to overrule its holding in *Schroeder*, "subsequent decisions by the court cast some doubt on the continued viability of that holding"); *Prairie View A & M Univ.*, 381 S.W.3d at 519 (Jefferson, J., dissenting) (questioning *Schroeder*'s continued viability and stating that it is inconsistent with recent Texas Supreme Court and United States Supreme Court decisions).

proposition for which Mission cites no authority), Lee's Title VII claims may not receive the benefit of the Original Petition's filing date.

To its second argument, Mission advances another proposition: relation back under Rule 15(c) must be to a "live" pleading at removal.[14] It points out that under Texas procedural rules, her First Amended Petition superseded the Original Petition and therefore, was the operative pleading at removal.[15] Further, Mission continues, under the Texas relation back rule, the First Amended Petition's § 1981 claims did not relate back to the Original Petition's TCHRA claims: the latter claims were "time-barred" for the same reasons that they were jurisdictionally defective and consequently, were "subject to a plea of limitation when the pleading [was] filed."[16] Therefore, the Second Amended Complaint, according to Mission, can only receive the benefit of the First Amended Petition's filing date.[17]

Although our appellate court has yet to decide the relation back issue on the facts of this case,[18] it has provided ample guidance for evaluating the merits of Mission's arguments. Mission's first argument is foreclosed by the Fifth Circuit's Rule 15(c) jurisprudence. "The viability of a cause of action in an original complaint does not necessarily affect the application

---

[14] *See* Reply to Def.'s MSJ at 2, 9.

[15] Def.'s MSJ at 7–8 (citing Tex. R. Civ. P. 65 ("Unless the substituted instrument shall be set aside on exceptions, the instrument for which it is substituted shall no longer be regarded as a part of the pleading in the record of the cause . . . unless it be necessary to look to the superseded pleading upon a question of limitation.")).

[16] *Id.* at 8. Under the Texas relation back rule, which is less generous than its federal counterpart, "[i]f a filed pleading relates to a cause of action . . . *that is not subject to a plea of limitation when the pleading is filed*, a subsequent amendment . . . to the pleading that changes . . . grounds of liability . . . is not subject to a plea of limitation unless the amendment . . . is wholly based on a new, distinct, or different transaction or occurrence." Tex. Civ. Prac. & Rem. Code Ann. § 16.068 (emphasis added).

[17] Def.'s MSJ at 9.

[18] Pl.'s Suppl. Br. at 1 (stating that a diligence search revealed no Fifth Circuit opinion squarely addressing the applicability of the federal relation-back doctrine under the facts of this case); Def.'s Suppl. Br. at 1 (same).

of the relation-back doctrine. . . . [A]n amendment can relate back even though the original claim is not within the jurisdiction of the court." *Watkins v. Lujan*, 922 F.2d 261, 264 (5th Cir. 1991). In a number of cases, the Fifth Circuit has repeatedly held that an amended claim related back to the original complaint that asserted jurisdictionally defective or time-barred claims. *See Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 342–43 & n.3 (5th Cir. 2005) (amended complaint's § 1981 claims related back to the original complaint asserting Title VII claims that "had a jurisdictional defect"); *Johansen v. E.I. Du Pont De Nemours & Co.*, 810 F.2d 1377, 1380 (5th Cir. 1987) (amended complaint's state-law claims related back to the original complaint asserting time-barred state-law claims); *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1068 (5th Cir. Unit A June 1981) (amended complaint's Title VII claim related back to the original complaint asserting § 1981 claim that was not within the subject matter jurisdiction of federal court); *Caldwell v. Martin Marietta Corp.*, 632 F.2d 1184, 1189 (5th Cir. 1980) (amended complaint's Title VII claims related back to the original complaint asserting time-barred § 1981 claim). Although these cases involved original pleadings filed in federal court, there is no sound reason to believe that their holdings should not apply where, as here, the original pleading was filed in state court before removal.

Mission's second argument, despite its superficial appeal, also lacks merit. Mission is correct that the First Amended Complaint did not relate back to the Original Petition under the Texas relation back rule. Nonetheless, Mission's argument ultimately fails because its primary premise—that the amended claims may only relate back to a "live" pleading—is faulty. Nothing in Rule 15(c) supports, [19] nor has Mission cited any authority that supports, that proposition. *Cf.*

---

[19] To the contrary, Rule 15(c)(1) states: "An amendment to a pleading relates back to the date of the *original pleading* . . . ." Fed. R. Civ. P. 15(c)(1) (emphasis added). Therefore, under the plain meaning of the Rule, the Original Petition here is an "original pleading." *See Schiavone v. Fortune*, 477 U.S. 21, 30 (1986) ("We accept the Rule as meaning what it says.").

*e.g., F.D.I.C. v. Jackson*, 133 F.3d 694, 701–02 (9th Cir. 1997) (holding "the second amended complaint related back to the original complaint pursuant to [Rule 15]," and stating "the filing date of an original complaint remains operative for relation-back purposes even where otherwise superseded by amendments"). Indeed, courts, including the Fifth Circuit, do consider relation back to an original complaint where relation back to a superseding pleading does not render timely the amended claims. *See McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 863 n.23 (5th Cir. 1993) (analyzing relation back of the second amended complaint to the original complaint, because relation back to the first amended complaint does not further the plaintiff's cause); *Jackson v. Corp. Serv. Co.*, No. H-11-4404, 2013 WL 12177339, at *5–*6 (S.D. Tex. Feb. 6, 2013) (analyzing same, where the relevant claims in the first amended complaint were untimely).

Moreover, although it concedes that Rule 15(c)(1)(B) applies here, Mission in essence urges the Court to adopt a hybrid approach based on federal and state relation back rules. Sound policy reasons counsel against adopting such an approach. *See* 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1503 (3d ed. 2010) ("[T]here are strong federal interests encouraging the application of Rule 15(c), even at the expense of state relation-back law." (discussing various federal interests)). In particular, "application of state rules as to relation back would disrupt important federal policies favoring . . . liberality of amendment." *Welch v. La. Power & Light Co.*, 466 F.2d 1344, 1346 (5th Cir. 1972) (*per curiam*); *see also Sanders-Burns v. City of Plano*, 594 F.3d 366, 375 (5th Cir. 2010) ("Rule 15(c) serves as a useful guide to help, not hinder, persons who have a legal right to bring their problems before the courts." (internal quotation marks and citation omitted)).[20]

---

[20] *Cf. Johansen*, 810 F.2d at 1380 ("When a federal rule of civil procedure specifically covers a particular situation, a federal diversity court is required to apply the federal rule unless application of the

Finally, Mission urges that even if Lee could relate back to the Original Petition, the Court should not permit her to do so, because to do otherwise would be "prejudicial" to Mission.[21] The Court disagrees. "So long as the [employment discrimination] claim is based on the discrimination originally charged in the complaint, allowing it to relate back to the date of filing . . . works no hardship on the defendant for the original complaint furnished adequate notice of the nature of the suit." *Watkins*, 922 F.2d at 265 (internal quotation marks and citation omitted).[22]

In sum, because Rule 15(c)(1)(B) applies here and the parties do not dispute that Lee's Title VII claims in the Second Amended Complaint arise from the same operative facts set forth in her Original Petition, the Court finds that the claims relate back to the Original Petition's filing date and therefore, are timely. Accordingly, the Court denies Mission's motion for summary judgment on this ground.

## B. The Timeliness of the Title VII Hostile Work Environment Claims and the Continuing Violation Doctrine

Mission argues that Lee's Title VII hostile work environment claims based on her sex, race, and national origin are barred by the 300-day statute of limitations.[23] *See* 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed . . . within three hundred days after the

---

federal rule violates the Enabling Act or the Constitution."); 3 James Wm. Moore et al., *Moore's Federal Practice* § 15.20 (3d ed. 2017) ("When the federal relation-back is more generous than a conflicting state rule, federal courts should apply Rule 15(c).").

[21] Def.'s MSJ at 10.

[22] *See also United States v. Johnson*, 288 F.2d 40, 42 (5th Cir. 1961) ("'When a suit is filed in a federal court under the Rules, *the defendant knows* that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action . . . or the law relied on will not be confined to their first statement.'" (emphasis added) (quoting *Barthel v. Stamm*, 145 F.2d 487, 491 (5th Cir. 1944))).

[23] The "300-day period is often referred to as the 'charging' or 'filing' period." *Green v. Brennan*, 136 S. Ct. 1769, 1784 n.1 (2016) (Alito, J., concurring). The Court here refers to this period as the filing period, charge filing period, or limitations period.

alleged unlawful employment practice occurred."). Specifically, it points out that Lee filed her EEOC charge of discrimination on December 16, 2014; therefore, any alleged harassing act that occurred before February 19, 2014 (*i.e.*, 300 days before the filing of her charge) is time-barred.[24] Mission, moreover, maintains that because there is no evidence that any harassing act occurred during the relevant period (*i.e.*, February 19, 2014, through March 6, 2014, when she resigned), Mission is entitled to summary judgment on Lee's hostile work environment claims.[25]

Lee responds that Mission forced her to resign on March 6, 2014, which fell within the limitations period; thus, that act renders actionable all of the pre-limitations acts under the "continuing violation" doctrine articulated in *National R.R. Passenger Corporation v. Morgan*, 536 U.S. 101 (2002).[26] *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004) (noting *Morgan* "clarified the limits of the continuing violations doctrine").

In *Morgan*, the Supreme Court "distinguishe[d] discrete acts that form the basis of traditional discrimination claims from continuing conduct that forms the basis of hostile work environment claims." *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017). The Court held that § 2000e-5(e)(1) precludes recovery for time-barred discrete acts of discrimination—such as termination, failure to promote, denial of transfer, or refusal to hire—and retaliation, even if they are related to acts alleged in timely filed charges. *Morgan*, 536 U.S. at 105, 113–14, 122. Therefore, the continuing violation doctrine does not apply to claims challenging time-barred discrete acts of discrimination and retaliation. *See id.* at 114–115. However, "[h]ostile environment claims are different in kind from discrete acts," said the Court. *Id.* at 115. Such a claim "is composed of a series of separate acts that collectively

---

[24] Def.'s MSJ at 10.

[25] *Id.* at 11.

[26] Resp. to Def.'s MSJ at 7–8.

constitute one 'unlawful employment practice,'" *id.* at 117 (quoting § 2000e-5(e)(1)), which

"occurs over a series of days or perhaps years," *id.* at 115. Hostile work environment claims are

subject to the continuing violation theory: "Provided that *an act contributing to the claim* occurs

within the filing period, the entire time period of the hostile environment may be considered by a

court for the purposes of determining liability." *Id.* at 117 (emphasis added).[27]

Post *Morgan*, the Fifth Circuit has articulated a test for assessing the viability of a

continuing violation theory for hostile work environment claims:

> (1) the plaintiff must demonstrate that the separate acts are [sufficiently] related;
> (2) the violation must be continuing; intervening action by the employer, among
> other things, will sever the acts that preceded it from those subsequent to it; and
> (3) the doctrine may be tempered by the court's equitable powers, which must be
> exercised to honor Title VII's remedial purpose without negating the particular
> purpose of the filing requirement.

*Heath*, 850 F.3d at 738 (internal quotation marks omitted) (citing *Stewart v. Miss. Transp.*

*Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009)); *see also Stewart*, 586 F.3d at 329 (finding acts are

"sufficiently" related). (We shall refer to this test as the *Stewart* test.) The first element of the

test *per force* requires the plaintiff to identify at least one act "contributing to the claim [that]

occur[ed] within the filing period." *Morgan*, 536 U.S. at 117. For purposes of the test, it is

irrelevant whether the acts constitute sufficiently severe or pervasive harassment. *Stewart*, 586

F.3d at 329 n.1; *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010)

(rejecting the argument that the within-limitations period incident must satisfy the severe or

pervasive standard of a hostile work environment claim in order to contribute to the claim for

---

[27] To illustrate, the Supreme Court stated that the continuing violation doctrine may apply where
acts contribute to a hostile environment on days 1–100 and on day 401, but there are no acts between days
101–400. *Morgan*, 536 U.S. at 118. The Court, however, cautioned that if the act on day 401 "had no
relation to the acts between days 1–100, or for some other reason, such as certain intervening action by
the employer, was no longer part of the same hostile environment claim, then the employee cannot
recover for the previous acts, at least not by reference to the day 401 act." *Id.* (emphasis added).

purposes of the continuing violation doctrine).[28]

Returning to the parties' arguments, they agree that Lee's alleged forced resignation is a discrete act that fell within the limitations period.[29] However, they dispute, and consequently, the issue is, whether, in view of *Morgan*, a non-time-barred discrete act may constitute an act contributing to a hostile work environment claim and therefore, serve as the basis for applying the continuation violation doctrine.[30] In Mission's view, consistent with *Morgan*, a discrete act may not be part of a hostile work environment claim.[31]

In support, Mission relies on the following statement in the *Morgan* opinion: "This Court has also held that discrete acts that fall within the statutory time period do not make timely <u>acts that fall outside the time period</u>." *Morgan*, 536 U.S. at 112 (underline supplied). Read in context, that statement does not help Mission. By that statement, the Court referred to two of it precedents, which it discussed immediately following the statement. *Id.* (discussing *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977), and *Delaware State College v. Ricks*, 449 U.S. 250 (1980)). The referenced "<u>act[] that [fell] outside the time period</u>" in each of these cases was a *time-barred* discrete act: in *Evans*, the employer's act of forcing the employee "to resign after she married because of its policy against married female flight attendants," *id.*; *see also Evans*, 431 U.S. at 554, and in *Ricks*, the employer's decision to deny academic tenure to the employee (a professor), *Morgan*, 536 U.S. at 112; *Ricks*, 449 U.S. 257–58. Indeed, after discussing these

---

[28] *See also Morgan*, 536 U.S. at 116 (A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (brackets and internal quotation marks omitted)).

[29] Reply to Def.'s MSJ at 4; Pl.'s Suppl. Br. at 2.

[30] Reply to Def.'s MSJ at 5–6.

[31] *Id.* at 5.

cases, the Court said: "We derive several principles from these cases. First, discrete

discriminatory acts are not actionable if time barred, even when they are related to acts alleged in

timely filed charges. . . ." *Morgan*, 536 U.S. at 113. That, however, is not the issue in this case,

because Lee's claims do not rely on, nor do they attempt to revive, any time-barred discrete act.

Mission then argues that *Morgan* does not expressly say that a non-time-barred discrete

act could breathe life into an otherwise untimely hostile work environment claim.[32] But the

reverse is also true: *Morgan* does not expressly say that it could not. Other than reading the tea

leaves of the *Morgan* opinion, *but see United States v. Hines*, No. 1:12-CR-00204-JAW, 2014

WL 1875164, at *8 (D. Me. May 9, 2014) ("Reading Supreme Court tea leaves is chancy."),

Mission has pointed to no authority, binding or otherwise, that addresses the issue at hand and

supports Mission's position thereon.

Lee, for her part, points out that post *Morgan*, the Fifth Circuit has not addressed the

issue presented here, though three other courts of appeal have.[33] They have held that a non-time-

barred discrete act can be the basis for applying the continuing violation doctrine to a hostile

work environment claim. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir.

2016) ("[T]he issue in this case is whether non-time-barred discrete acts can be considered part

of the 'series of separate acts that collectively' create a hostile work environment, thus rendering

a hostile-environment claim timely under the continuing-violation doctrine. . . . So long as the

act is part of the pattern of discriminatory treatment against the employee, then that act should be

sufficient for purposes of the continuing-violation doctrine, even if the act would otherwise

qualify as a discrete act that is independently actionable." (quoting *Morgan*, 536 U.S. at 117, and

citing *Green*, 136 S. Ct. at 1777–78); *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345,

---

[32] *See* Resp. to Pl.'s Suppl. Br. at 2.

[33] Pl.'s Suppl. Br. at 1–4.

1350 (11th Cir. 2007) ("Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim."), *accord Gowski v. Peake*, 682 F.3d 1299, 1313 (11th Cir. 2012) (*per curiam*); *Baird v. Gotbaum*, 662 F.3d 1246, 1251–52 (D.C. Cir. 2011) (holding the lower court erred by failing to employ the *Morgan* analysis to time-barred acts, and stating, on "a closely related argument," that a court may not "dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own").

The Court finds persuasive these decisions by the Courts of Appeals for the Fourth, Eleventh, and District of Columbia Circuits. Accordingly, it holds that a non-time-barred discrete act may constitute an act contributing to a hostile work environment claim and therefore, may properly be the basis for applying the continuation violation doctrine. *See, e.g., Barnes v. McHugh*, No. 12-CV-2491, 2013 WL 3561679, at *4 (E.D. La. July 11, 2013) ("[The employee] alleges that [her employer] failed to promote her . . . . She has thus alleged a discriminatory act that contributes to the [hostile work environment] claim and falls into the filing time period.").

The Court now determines whether Lee's hostile work environment claims involve a continuing violation applying the *Stewart* test. According to Lee, some of the harassing acts occurred during her first term of employment, which lasted from April 2009 to October 2012. The other alleged acts occurred during her second term, but before February 19, 2014, the cut-off date for limitations purposes. There appears to be a dearth of case law analyzing continuing violation spanning over two periods of employment separated by an intermediate period, during which the plaintiff-employee was not employed by the defendant-employer; nor have the parties directed the Court to any Fifth Circuit case analyzing same.

First, the Court finds that the alleged acts of sexual harassment that occurred during Lee's second term form part of the same hostile work environment sexual harassment claim under the continuing violation doctrine. Lee has adduced evidence of various acts of sexual nature that occurred during this term, though before February 19, 2014; they include Slaughter's sexual advances, grabbing, and offensive remarks.[34] Her forced resignation occurred within the limitations period: she claims that Slaughter forced her to resign for resisting, rebuffing, and opposing his sexual harassment.[35] She has adduced evidence in support of that claim.[36] Accordingly, the Court finds that Lee has carried her burden to show that her forced resignation is sufficiently related to the alleged acts of sexual harassment that occurred during the second term, but before February 19, 2014. There is no evidence of an intervening act between these acts and her forced resignation. Further, Mission "ha[s] pointed to no equitable consideration that should prevent the [C]ourt from considering the full scope of the continuing conduct." *See Heath*, 850 F.3d at 741.

Next, the Court finds that the alleged acts of sexual harassment that occurred during the first term of her employment fail to satisfy the second prong of the *Stewart* test. An employer will not be liable for the pre-limitations acts, if "*for some other reason*, such as certain *intervening* action by the employer," the post-limitation act is "no longer part of the same hostile [work] environment claim" encompassing the pre-limitations acts. *Morgan*, 536 U.S. at 118 (emphasis added). Lee's first term ended in October 2012, when she resigned, and seven months thereafter, she was re-hired by Mission in May 2013. There is no evidence that her 2012

---

[34] Pl.'s MSJ at 5–9; *see post*, Part III.C.

[35] Second Am. Compl. ¶¶ 36–28; Pl.'s MSJ at 3, 13, 16, Resp. to Def.'s MSJ at 13.

[36] Pl.'s MSJ at 11–14; Resp. to Def.'s MSJ at 19–22; *see also post*, Part III.D.2.

resignation was in any way precipitated by the alleged harassing acts; instead, it is undisputed that she voluntarily resigned so that she could move to another part of Texas with her then boyfriend.[37] Accordingly, the Court finds Lee may not recover for the 2009–2012 acts by reference to her March 6, 2014 forced resignation. *Compare Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) (sexual harassment was a continuing violation spanning over two periods of employment, where the first period ended in the employee's termination because she was unable to return to work from a sick leave taken "on account of the illness precipitated" by the harassing conduct), *accord, Jensen v. Henderson*, 315 F.3d 854, 861 (8th Cir. 2002) (a post *Morgan* decision), *with E.E.O.C. v. Simbaki, Ltd.*, No. H-12-0221, 2013 WL 2368338, at *8 (S.D. Tex. May 23, 2013) (finding no continuing violation because "the severance . . . is much more definitive because [the plaintiff] no longer worked for [the defendant]"), *rev'd on other grounds*, 767 F.3d 475 (5th Cir. 2014).

Finally, the Court finds that there was no continuing violation of Lee's hostile work environment claims based on her race and national origin. She has proffered evidence that Slaughter uttered various slurs and epithets based on her race and national origin—all of which occurred before February 19, 2014.[38] She, however, has failed to adduce evidence from which a reasonable jury could conclude that her forced resignation was related to the alleged slurs and epithets.[39]

In sum, the Court grants Mission's motion for summary judgment on Lee's Title VII hostile work environment claims based on race and national origin. On Lee's Title VII hostile work environment sexual harassment claim, the Court denies Mission's motion as to the alleged

---

[37] Resp. to Def.'s Undisputed Facts at 2.

[38] Resp. to Def.'s MSJ at 15-17.

[39] *Cf. post*, Part III.E.2.

acts of sexual harassment that occurred during the second term of her employment, but grants its motion as to the alleged acts of sexual harassment that occurred during the first term of her employment.

## C. Hostile Work Environment Sexual Harassment Claim

Lee moves for summary judgment on her Title VII hostile work environment sexual harassment claim. Title VII prohibits sexual harassment that takes the form of a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Where, as here, the claim of harassment is against a supervisor, there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a "term, condition, or privilege" of employment. *Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 162–63 (5th Cir. 2007).

To satisfy the fourth element, sexual harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Lauderdale*, 512 F.3d at 163 (brackets, internal quotation marks, and citation omitted). To determine whether conduct is severe or pervasive, courts look to "the totality of the circumstances." *Stewart*, 586 F.3d at 330. "Relevant factors include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks and citation omitted). "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Lauderdale*, 512 F.3d at 163; *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 435 (5th Cir. 2005) ("'Even a single

incident of sexual assault sufficiently alters the conditions of the victim's employment.'"

(brackets, internal quotation marks, and citation omitted)). "The inverse is also true: Frequent

incidents of harassment, though not severe, can reach the level of 'pervasive.'" *Lauderdale*, 512

F.3d at 163. "Thus, the required showing of severity or seriousness of the harassing conduct

varies inversely with the pervasiveness or frequency of the conduct." *Id.* (internal quotation

marks and citation omitted).

The Court turns to whether Lee has met her burden as to the fourth element of proof—the

severity or pervasiveness of Slaughter's conduct. To meet her burden, she has adduced evidence

of Slaughter's acts that occurred during the first and second terms of her employment.[40] Because

the Court has found that the continuing violation doctrine applies to the alleged acts of sexual

harassment during the second term, these acts are relevant to the Court's inquiry for purposes of

Mission's liability. Further, even though the doctrine does not apply to the alleged acts that

occurred during the first term, they provide relevant background for that inquiry. *See Ramsey v.

Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) ("For a hostile working environment . . . [,]

[d]iscriminatory incidents outside of the filing period may be relevant background information to

current discriminatory acts."); *Morgan*, 536 U.S. at 113 ("Nor does the statute bar an employee

from using the prior acts as background evidence in support of a timely claim."); *Clark Cty. Sch.

Dist. v. Breeden*, 532 U.S. 268, 270 (2001) ("Workplace conduct is not measured in isolation.").

According to Lee's testimony, Slaughter engaged in the following conduct during her

second term of employment. Beginning in October 2013, on multiple occasions, Slaughter asked

her to be at his office after hours and kept her there until very late at night with the door closed:

according to her, they "were not even talking about work" and he wanted her to listen to his

---

[40] Pl.'s MSJ at 4–10.

-21-

music and talk about his younger days.[41]  On one of those occasions, in late December 2013, Slaughter asked her to dance with him, but she said no; yet, he grabbed her and tried to rub his chest against her breasts.[42]  Over further objections by Lee, Slaughter told her, "every time I look into your eyes, . . . it just makes me feel . . . something."[43]  In or after January 2014, he told her that when they would go to out-of-town meetings, she could have drinks or go dancing with him.[44]  On yet another day, he told her that his wife was going to have a surgery to "tie [her] pussy."[45]

Lee produced evidence of the following acts by Slaughter—some of these occurred during her first term of employment, though others might have occurred during the early part of her second term.  She testified that during weekly sales meetings, Slaughter often used vulgar words such as "fuck," "asshole," and "dick."[46]  He referred to women as "hookers," "pussies," and "bitches," when he explained to the staff how to sell cars to prospective buyers: "Remember, . . . the man has the money and the women has [sic] the pussy" and "like a girl at club, . . . you can get to her just by talking sweet to her, . . . and next thing you know, . . . you're there in bed with her."[47]  Moises Lagos, a former sales manager at Mission, states that Slaughter "always made comments about women's sexuality, about whether a woman was good in bed, good at

---

[41] Resp. to Def.'s MSJ, Ex. A at 39:16–19, 58:17–23, 73:23–25, 74:10-17, 79:19, 87:2–88:3 [hereinafter Lee Dep.], ECF No. 23-2.

[42] Id. at 74:2–76:10.

[43] Id. at 76:11–12, 76:23–23.

[44] Id. at 85:13–25.

[45] Id. at 79:22–80:17.

[46] Id. at 51:12–25.

[47] Id. at 46:25–47:1, 50:21–51:3, 52:7–10.

giving blow jobs, [and] ma[d]e comments about their 'tits' and 'ass.'"[48] He also states that "[i]f

someone was sick, Jerry Slaughter would ask . . . 'if our pussies were bleeding.'"[49]

Lee also adduced evidence that Slaughter made sexual advances toward another female

salesperson, Yolanda Vega, who worked at Mission during Lee's second term.[50] *See Hernandez*

*v. Yellow Transp., Inc.*, 670 F.3d 644, 653 (5th Cir. 2012) ("[H]arassment of women other than

the plaintiff is relevant to a hostile work environment claim."). According to Orlando Urias, a

Mission salesman, Slaughter told him that Vega "has a nice body. I'd like to just grab her tits

just to see how they feel."[51]

From this evidence, in view of other evidence Lee adduced,[52] a reasonable jury could find

that Slaughter's harassment was sufficiently severe or pervasive. However, Mission argues that

there is a fact issue as to whether any of these alleged incidents even occurred because Slaughter

---

[48] Pl.'s MSJ, Ex. H ¶ 11 [hereinafter Lagos Aff.], ECF No. 15-2.

[49] *Id.* ¶ 10.

[50] Lagos Aff. ¶¶ 14–15. Lee submitted affidavits of Vega and Alejandro Casillas (each a former Mission employee), but Mission objects to these affidavits on the ground that Lee failed to disclose Vega and Casillas in her Rule 26(a) initial disclosures. "If a party fails to . . . identify a witness as required by Rule 26(a)," that party "is not allowed to use that . . . witness to supply evidence on a motion, . . . *unless the failure was substantially justified or is harmless.*" Fed. R. Civ. P. 37(c)(1) (emphasis added). Lee has not addressed Mission's objections, nor has she stated the reason for her failure to timely disclose them. Therefore, for purposes of the instant motions, the Court does not consider Vega and Casillas's affidavits. Lee, however, submitted affidavits of other former employees that include declarations about Slaughter's conduct toward Vega; because Mission does not object to these other affidavits, the Court considers them here.

[51] Resp. to Def.'s MSJ, Ex. J ¶ 12, ECF No. 23-2.

[52] Lee's other evidence chronicles a string of events that occurred between January 2014 and March 6, 2017, when she was allegedly forced to resign. *See post*, Part III.D. She also proffered evidence of Slaughter's attempts to break up her relationship with Jimmy by telling one, in the absence of the other, negative things about the other: for example, Slaughter told Jimmy that Lee was not a "marrying type" of woman and she was a "barfly." Resp. to Def.'s MSJ, Ex. B at 17:13-17 [hereinafter Jimmy Dep.], ECF No. 23-2; *see also Donaldson v. CDB Inc.*, 335 F. App'x 494, 502 (5th Cir. 2009) (*per curiam*) (When viewed in the totality of the circumstances, actions that are "not sexually-charged . . . lend support to the existence of . . . an abusive working environment.").

denies these allegations. Specifically, Slaughter states that he never sexually harassed Lee or otherwise acted inappropriately towards her, denies making any of the sexual comments about which Lee testified, and further denies making any sexual comments or advances alluded to in the affidavits of other employees.[53] The Court finds that there is a fact issue as to the fourth element of proof and therefore, denies Lee's motion for summary judgment on her hostile work environment sexual harassment claim.

## D. Retaliation

Both Mission and Lee move for summary judgment on her Title VII retaliation claim. Moreover, in response to Mission's motion, Lee advances the same arguments that she does in her motion, and Mission, in its reply in support of its motion, incorporates by reference the arguments it makes in response to Lee's motion. The Court will first address Mission's motion, drawing all reasonable inferences in Lee's favor, and thereafter turn to Lee's motion.

Because Lee does not present any direct evidence of retaliation, her retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework. *See Davis*, 765 F.3d at 489. Under the framework, an employee "must establish that: (1) [s]he participated in an activity protected by Title VII; (2) [her] employer took an adverse employment action against [her]; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (*per curiam*). If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. *Id.* at 557. If the employer meets its burden, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. *Id.* An employee establishes pretext by showing that "the adverse employment action would not have occurred

---

[53] Resp. to Pl.'s MSJ, Ex. C ¶¶ 24–26 [hereinafter Slaughter Aff.], ECF No. 24-4.

'but for' the employee's decision to engage in an activity protected by Title VII." *Alkhawaldeh v. Dow Chem. Co*, 851 F.3d 422, 427 (5th Cir. 2017) (brackets, internal quotation marks, and citation omitted).

Here, Mission argues that it is entitled to summary judgment because Lee cannot establish a prima facie case of retaliation. Below, the Court addresses each element of Lee's prima facie case.

### 1. Protected Activity

Mission disputes the evidence Lee proffers in support of her claim, but then makes an argument of the form that *assuming arguendo* that her evidence is believed, none of her alleged actions or complaints constitute a protective activity.[54] Under Title VII's anti-retaliation provision, "protected activity can consist of either: (1) 'oppos[ing] any practice made an unlawful employment practice by this subchapter,' or (2) 'ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter.'" *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (alterations in original) (quoting 42 U.S.C. § 2000e-3(a)). The first of these is known as the "opposition clause;" the second as the "participation clause." *Id.* At issue here is the opposition clause.

As noted by the Supreme Court, the term "oppose" is undefined by Title VII and therefore "carries its ordinary meaning," which is "'to resist or antagonize; to contend against; to confront; resist; withstand.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (ellipses and brackets omitted) (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1958)). However, "opposition . . . must be purposive." *Thompson v. Somervell Cty., Tex.*, 431 F. App'x 338, 341 (5th Cir. 2011) (citing *Crawford*, 555 U.S. at 281 (Alito, J., concurring) ("The primary definitions of the term 'oppose' . . . require conduct that is .

---

[54] Def.'s MSJ at 18; Reply to Def.'s MSJ at 10; *see also* Resp. to Pl.'s MSJ at 12–13.

. . purposive")). Thus, rejecting sexual advances, without more, does not constitute a protected

activity for purposes of a Title VII retaliation claim. *LeMaire v. La. Dep't of Transp. & Dev.*,

480 F.3d 383, 389 (5th Cir. 2007) (citing *Frank v. Harris Cty.*, 118 F. App'x 799, 804 (5th Cir.

2004)); *Giddens v. Cmty. Educ. Cntrs., Inc.*, 540 F. App'x 381, 390 (5th Cir. 2013) (citing

*LeMaire*, 715 F.3d at 389).[55]

Whether an employee's statement or action is a protected "opposition" is a fact-specific

inquiry. *Yount v. S & A Rest. Corp.*, 226 F.3d 641, 2000 WL 1029010, at *3 (5th Cir. 2000) (*per

curiam*) (unpublished table decision). The following factors are relevant in determining whether

a statement or action falls within the ambit of the opposition clause: "the context in which the

[harassing conduct]" occurred, whether the harasser was "a person in a supervisory position,"

"the context in which [the employee] opposed her [harasser's] conduct," and "the setting in

---

[55] In each of these cases, the Fifth Circuit rejected an employee's claim that he/she engaged in a protected activity, stating that the employee provided no authority for the proposition that "rejecting sexual advances" or "a single 'express rejection'" of sexual advances constitutes a protected activity for purposes of a retaliation claim under Title VII. *Frank*, 118 F. App'x at 804; *LeMaire*, 480 F.3d at 389; *Giddens*, 540 F. App'x at 390. In *Frank*, the employee claimed that the protected activity she engaged in was her "express rejection" of sexual advances made by her supervisor. 118 F. App'x at 804. In *LeMaire*, a same-sex harassment case, on one occasion, the employee's supervisor said that he molested a man when he was a child and talked about how he enjoyed being close to other men and his gay friends; the employee asked the supervisor to "stop" talking about these issues. 715 F.3d at 385. Finally, in *Giddens*, the employee "consistent[ly] reject[ed]" her supervisor's advances. 540 F. App'x at 384.

"[T]here is a circuit split about whether a person who rejects a supervisor's sexual advances has engaged in a protected activity." *Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (citing, *inter alia*, *LeMaire*, 480 F.3d at 389, as holding that "a single, express rejection of sexual advances does not constitute 'protected activity.'"); *see also Mihalik v. Credit Agrcole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 115 n.12 (2d Cir. 2013) (declining to express any opinion on whether merely rejecting a sexual advance is cognizable under the federal anti-retaliation law (citing, *inter alia*, *LeMaire*, 480 F.3d at 389, as holding that "'rejecting sexual advances' in and of itself is not a protected activity"). More recently, in view of the broad definitions of "oppose" adopted in *Crawford*, the Sixth Circuit has held that an employee's "demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015) (declining to follow *Frank*); *but see Jackson-Hall v. Moss Point Sch. Dist.*, No. 3:11-CV-42-DPJ-FKB, 2012 WL 692416, at *2 (S.D. Miss. Mar. 2, 2012) ("These holdings [in *LeMaire* and *Frank*] are consistent with *Crawford*.").

which [the employee] voiced her" statement or took the action. *Rite Way Serv., Inc.*, 819 F.3d at 242–44.

The Court considers the following instances of alleged oppositions for which Lee claims that Mission retaliated against her: (i) her statement to Slaughter made during the December 2013 grabbing incident; (ii) her statement made in or after January 2014 to Slaughter regarding out-of-town meetings; and (iii) her complaint to Mary Alvidrez, Mission's human resources manager, about Slaughter's keeping her late at night.[56]

### (i) December 2013 Grabbing

According to Lee's evidence, in or around December 2013, when Slaughter allegedly grabbed her to dance with him, she told him "No," and "Sir, this is not right, we need to go."[57] Mission argues that under *LeMaire*, this was not a protected activity. The Court agrees. This was merely a rejection of Slaughter's sexual advances and not purposive.

### (ii) Out-of-Town Meetings

Further according to Lee's evidence, sometime in January 2014 or thereafter, Slaughter told her that when they would go to an out-of-town meeting, she could have drinks or go dancing with him after the meetings; she responded: "If it's going to be meetings and I have to go, I will go, but that's it, meetings."[58] This instance is similar to the example of an opposition the Supreme Court provided in *Crawford*: "And we would call it 'opposition' if an employee *took a stand against* an employer's discriminatory practices . . . by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." 555 U.S. at 277.

---

[56] Resp. to Def.'s MSJ at 19–20.

[57] *Id.* at 20; Lee Dep. at 76:2–12.

[58] Resp. to Def.'s MSJ at 20; Lee Dep. at 85:24–25.

Drawing all reasonable inferences in her favor, this was more than mere rejection of Slaughter's sexual advances. A reasonable jury could find that the statement was made with intent "to contend against[,] confront[,] resist [or] withstand," *see id.* at 276, Slaughter's alleged string of sexual advances and innuendoes, including the prior incident of grabbing,[59] and therefore, conclude that on this instance, Lee engaged in protected activity. *Cf. Thompson*, 431 F. App'x at 341–42 ("Because Thompson admits that her sole intent in requesting the documentation . . . was to find another position within the County, no reasonable jury could find that the request was made with intent 'to contend against, confront, resist or withstand' any long ago discriminatory practices by the County or its officials." (brackets omitted)).

Moreover, that Lee made the statement to Slaughter only, but failed to complain to Alvidrez about the incident, does not take her action outside the ambit of the opposition clause. *See Stewart v. RSC Equip. Rental, Inc.*, 485 F. App'x 649, 653 (5th Cir. 2012) (*per curiam*) (holding the employee's comments to her supervisor "suffice as opposition to racial discrimination"). Mission's anti-harassment policy says that "[i]f you feel that you are being harassed by another employee, you should at once make your feelings known to your immediate *supervisor*. If you feel that the matter cannot be discussed with your supervisor, arrange for a conference with a *General Manager*/Dealer to discuss your complaint."[60] It is undisputed that Slaughter was both Mission's General Manager and Lee's supervisor; moreover, Lee's evidence shows, and Mission does not dispute, that Slaughter held himself out as a part owner of Mission.[61]

---

[59] *See ante*, Part III.C.

[60] Resp. to Def.'s MSJ, Ex. I at 19 [hereinafter Mission's Policy] (emphasis added), ECF No. 23-2.

[61] Slaughter Aff. ¶ 2; Resp. to Pl.'s Undisputed Facts at xv, xviii.

### (iii) Complaint to Human Resource

Lee alleges that she complained to Alvidrez that "Mr. Slaughter was keeping me in his office very late at night."[62] Mission argues that this complaint is vague and therefore, is not a protected activity.[63]

A "vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011) (*per curiam*); *see also Baylor Richardson Med. Ctr.*, 476 F.3d at 349 (A communication that "contains no reference to conduct that could even plausibly be considered discriminatory in nature" does not give rise to a protected activity.). However, "[m]agic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) (*per curiam*).[64]

Specifically, Mission explains that her complaint is vague because it can be reasonably construed as a complaint about being required to work late as opposed to a complaint about sexual harassment.[65] Lee responds that Mission makes only attorney argument, which is not sufficient for summary judgment.[66] The Court agrees. So far as it appears, the only evidence of this complaint is Lee's deposition testimony elicited in response to questions by Mission's

---

[62] Resp. to Def.'s MSJ at 20; Lee Dep. at 58:17–19.

[63] Resp. to Pl.'s MSJ at 12.

[64] *See also Yount*, 2000 WL 1029010, at *3 ("[T]he relevant question is *not* whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." (emphasis in original) (ellipses, internal quotation marks, and citation omitted)).

[65] Resp. to Pl.'s MSJ at 12.

[66] Reply to Pl.'s MSJ at 8.

counsel, who did not further explore this matter. As such, it is unclear what else Lee said to Alvidrez when she allegedly made this complaint.

On the other hand, Lee has adduced evidence that shows that Slaughter was keeping her in his office with the door closed very late at night, allegedly not for work purposes.[67] She previously complained to Alvidrez that she found "very offensive" Slaughter's comments at the weekly meetings—apparently, with regard to his references to women as "hookers," "pussies," and "bitches."[68] Mission's anti-harassment policy says that "[h]arassment also includes unwelcome sexual advances, requests for sexual favors and other verbal, graphic, or physical conduct of a sexual nature."[69] Alvidrez, as the manager of Mission's human resources, was familiar with the policy, and Lee received a copy of the policy when she was rehired in 2009.[70] From this evidence, a reasonable jury could find that the complaint sufficiently alerted Alvidrez about Lee's reasonable belief that sexual harassment was at issue.

Mission, however, disputes that Lee ever made the above-mentioned statements and complaints, and further disputes Lee's evidence of Slaughter's conduct giving rise to these statements and complaints.[71] Consequently, the Court finds that there is a genuine issue for trial on whether Lee engaged in a protected activity.

---

[67] *See ante*, Part III.C.

[68] Lee Dep. at 46:25–47:1, 52:7–10, 50:21–51:3.

[69] Mission's Policy at 19 (emphasis added); Lee Dep. at 30:4–7.

[70] Def.'s MSJ, Ex. D ¶ 4 [hereinafter Alvidrez Aff.], ECF No. 16-5; *see also Rite Way Serv., Inc.*, 819 F.3d at 244 (considering the employee's receipt of the employer's policy against sexual harassment in determining whether the employee "could have reasonably believed that the conduct about which she chose to speak violated Title VII").

[71] Resp. to Pl.'s MSJ at 5, 8–9, 13; Alvidrez Aff. ¶ 5; Slaughter Aff. ¶¶ 24–25, 29.

## 2. *Adverse Employment Action*

Lee claims that on March 6, 2014, Slaughter constructively discharged her for resisting his sexual harassment by giving her the false choice to resign or be fired.[72] "Where . . . an employee resigns, she may satisfy the [the adverse employment action] requirement by proving *constructive* discharge." *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997) (emphasis in original); *see also Harvill*, 433 F.3d at 439 ("Constructive discharge is the adverse employment action that is the basis for [the plaintiff-employee's] retaliation claim."). A constructive discharge may occur in two ways. *See Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338–39 (5th Cir. 2014). "'A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *McCoy*, 492 F.3d at 557 (quotation marks and citation omitted). Alternatively, constructive discharge occurs "if the employer gives the employee an ultimatum to quit or be fired." *Perret*, 770 F.3d at 338; *see also Fowler v. Carrollton Pub. Lib.*, 799 F.2d 976, 981 (5th Cir. 1986) ("Constructive discharge in these cases ar[i]se[s] from the employee's finding himself between the Scylla of voluntary resignation and the Charybdis of forced termination."). "[I]n these ultimatum cases, courts have required something beyond the employee's subjective belief that termination was inevitable." *Perret*, 770 F.3d at 339. Lee claims that her constructive discharge occurred in the second way.

Mission, on the other hand, claims that Lee voluntarily resigned. In support, it points to Lee's letter of resignation where she stated that she resigned because she had accepted Jimmy's proposal for marriage and to avoid any "possible conflict of interest at the store and . . . for the

---

[72] Resp. to Def.'s MSJ at 13.

best of the company."[73] Mission further points to a hand-written letter by Jimmy, where he stated that Lee "is tendering her resignation on a voluntary basis" and repeats the same reasons for resignation as in Lee's letter.[74] Therefore, Mission insists, even assuming for purposes of summary judgment that Lee's account of her resignation is true, which Mission denies, the evidence still supports that she was involuntarily discharged.[75]

The Court begins with Lee and Jimmy's accounts of the events leading up to her resignation. In January 2014, in hopes of stopping Slaughter's sexual advances, Lee and Jimmy disclosed their relationship to Slaughter.[76] Slaughter responded that Mission would have no issue with their relationship, so long as they kept it discrete.[77] On the evening of March 5, 2014, Slaughter summoned Lee and Jimmy into his office: according to Slaughter, he received complaints that Jimmy was waiting around Lee's work area near the end of her shift and he pressured her to leave work early; Slaughter wanted to address these complaints.[78] (By this time,

---

[73] Def.'s MSJ at 12–13. The letter states, in its entirety:

I'm Mari Morales declares that I'm having a romantic relationship with my lateral co-worker Jimmy Lee who is the Finance director at Mission Chevrolet. *I was proposed to get married and I accepted, due to possible conflict of interest at the store and looking forward for the best of the company I am stepping down and resigning as a sales manager.* We have the opportunity to spoke [*sic*] with our General Manager Jerry slaughter and we both were offered an option to decide our future with the company, I'm leaving In good terms and excited to the days to come as a future wife, I feel very comfortable with my decision and I want a take this opportunity to thank Mission Chevrolet for the opportunities received during my years of work.

*Id.*, Ex. A, Ex. 7 (emphasis added).

[74] Def.'s MSJ at 13; *id.*, Ex. A, Ex. 8.

[75] Def.'s MSJ at 13.

[76] Resp. to Def.'s MSJ at 20; Jimmy Dep. at 23:25–24:2.

[77] Slaughter Aff. ¶ 10; Jimmy Dep. at 16:17–18.

[78] Lee Dep. at 89:21–90:12; *see also* Slaughter Aff. ¶ 11.

Lee had told Jimmy that Slaughter was keeping her late at night, so, Jimmy would wait for her at her work area before going home.[79]) At some point, an argument ensued between Jimmy and Slaughter, and Jimmy yelled at Slaughter: "Don't you think I don't know that you . . . tried to force . . . my girlfriend to dance?"[80] After they calmed down, Lee said: "This is making me very unhappy. . . . I don't want to go through this anymore."[81] Slaughter responded, "everything is going to be fine. The good thing is you both can stay [at Mission] . . . and just follow those rules"; Lee replied, "okay."[82] The March 5 incident ended around midnight, with Slaughter saying: "The dancing thing was a whole misunderstanding."[83]

Continuing with Lee and Jimmy's accounts of the events, around 9:00 a.m. in the morning of March 6, 2014, Slaughter again summoned Lee and Jimmy into his office.[84] This time, he told them that he spoke with an attorney, and that one of them had to resign or both would be terminated.[85] Slaughter said that their working together violated Mission's non-fraternization policy.[86] (Before the Court, Mission concedes that there is no such policy in its employee handbook, and Lee submitted an affidavit of a former employee who attests that Mission had no such policy.[87]) Slaughter also told them that if Lee resigns, she could someday

---

[79] Lee Dep. at 89:21–90:12.

[80] Lee Dep. at 93:2–8; Jimmy Dep. at 23:15–18.

[81] Lee Dep. at 96:14–18.

[82] *Id.* at 96:19–22.

[83] Jimmy Dep. at 33:24–25.

[84] Lee Dep. at 98:4–7.

[85] *Id.* at 98:14–16; Jimmy Dep. at 35:15–19.

[86] Jimmy Dep. at 36:13–21.

[87] Def.'s Resp. to Pl.'s Undisputed Facts at xxii; Resp. to Def.'s MSJ, Ex. F ¶ 8, ECF No. 23-2.

work for Mission again, but if Jimmy resigns, he could not.[88]  Because Jimmy earned more than Lee, they decided that Lee would resign.[89]  Slaughter asked each to write a letter and told them what to write.[90]  (Before the Court, Slaughter states that he asked Jimmy "to write a statement that [Lee's] resignation was actually voluntary."[91])  Jimmy wrote the letter by hand.[92]  As for Lee, she told Slaughter that she could not write in English, and Slaughter responded that Jorge Bolivar, a Mission employee, would help her with that.[93]  Slaughter told Lee and Bolivar what to write in the letter; Bolivar typed the letter; and Slaughter told Lee that she had to sign it.[94]

Mission disputes Lee and Jimmy's accounts of the circumstances leading up to her resignation and more importantly, their accounts of what happened on March 6.[95]  The Court finds that there is a genuine dispute of material fact as to whether Lee voluntarily resigned or was forced to quit.  Resolution of this dispute is properly within the province of the trier of fact, and therefore, summary judgment is inappropriate.  *See Mendoza v. City of Palacios*, No. 3:11-CV-390, 2013 WL 3148667, at *4 (S.D. Tex. June 19, 2013) (noting that the supervisor and employee's conflicting accounts of the events that led to the employee's resignation constituted a factual dispute that alone may be enough to get past summary judgment), *accord, McMann v.*

---

[88] Lee Dep. at 98:12–16; Jimmy Dep. at 35:20–36:2.

[89] Lee Dep. at 99:22–100:1; Jimmy Dep. at 37:3–5, 38:13–14.

[90] Jimmy Dep. at 38:18–22.

[91] Slaughter Aff. ¶ 19.

[92] Jimmy Dep. at 38:23–24.

[93] Lee Dep. at 100:17–19.

[94] *Id.* at 100:20–22.

[95] Slaughter Aff. ¶¶ 19, 23.

*Greystar Mgmt. Servs., LP*, No. 1:12-CV-909, 2013 WL 6243847, at \*4 (W.D. Tex. Dec. 2, 2013).

### 3. Causal Connection

Mission next contends that there is no evidence of a causal connection between Lee's alleged protected activity and forced resignation. An employee may satisfy the causal connection element by showing "close timing between [her] protected activity and an adverse action against [her]." *Feist v. La. Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (brackets, internal quotation mark, and citation omitted). "Such temporal proximity must generally be 'very close.'" *Id.* (quoting *Breeden*, 532 U.S. at 273–74). Whereas a time lapse of up to four months may be sufficiently close, a five month lapse is not close enough without other evidence of retaliation. *Id.* (citing illustrative cases).

It is unclear when Lee allegedly complained to Alvidrez about Slaughter's keeping her late at night; however, her opposition regarding out-of-town meetings allegedly occurred in or after January 2014. The time lapse between that opposition and her alleged constructive discharge was approximately two months or shorter. Such a very close time lapse is sufficient to establish the requisite causal connection for proposes of the prima facie case. *See Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219 (5th Cir. 2016) ("[T]he close timing between her protected activity and the denial of a raise—about two months—is sufficient to show causal connection for purposes of a *prima facie* case."); *see also Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) ("At the prima facie stage, the standard for satisfying the causation element is much less stringent than a 'but for' causation standard." (internal quotation marks and citation

omitted)). Therefore, Lee has created a genuine issue of material fact as to the causal connection between her alleged constructive discharge and at least one of the alleged protected activities.[96]

In sum, there are triable fact questions about the elements of the prima facie case of retaliation. Nonetheless, Mission could still prevail if it articulates a legitimate, non-retaliatory reason for its decision and Lee then fails to show that the reason is pretextual. Mission has not articulated any reason. *Cf. McMann*, 2013 WL 6243847, at *5 (noting that the employer contends that "[the employee] voluntarily resigned, but argues alternatively that if it did discharge [him], that discharge was proper based on [his] failure to secure a trash trailer that was ultimately stolen, as well as his other prior disciplinary actions"). The Court therefore denies Mission's motion on the retaliation claim. Further, the Court denies Lee's motion on same. *See* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2720 (4th ed. 2014) ("Both motions must be denied if the court finds that there is a genuine dispute of material fact.").

## E. Discrimination Because of Gender, Race, and National Origin

Mission moves for summary judgment on Lee's claims for gender, race, and national origin discrimination under Title VII and her claim for race discrimination under § 1981. Title VII prohibits an employer from discriminating "*because of . . . race*, color, religion, *sex*, or *national origin*." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Section 1981 "affords a federal

---

[96] Lee alleges a fourth instance of opposition that the Court has not considered in detail because regarding same, Lee's evidence of causal connection is insufficient. Specifically, in 2011–12 (*i.e.*, during the first term of her employment), she complained to Mission's human resources that Slaughter's weekly sales meetings were "offensive." Resp. to Def.'s MSJ at 19. The time lapse between this complaint and her alleged constructive discharge in March 2014 was more than sixteen months; moreover, Mission rehired her after she resigned in October 2012. Because Lee relies solely on temporal proximity as evidence of causal connection, she has failed to carry her burden. *Cf. Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (finding no causal connection, because "[o]ther than the five month time period, [the plaintiff] has presented no evidence of retaliation.").

remedy against discrimination in private employment on the basis of race." *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459–60 (1975).[97]

Because there is no direct evidence of discrimination here, the Court will assess Lee's discrimination claims under the *McDonnell Douglas* burden-shifting framework. *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001); *see also Morris v. Town of Indep.*, 827 F.3d 396, 400 (5th Cir. 2016) ("Claims of racial discrimination based on circumstantial evidence under § 1981 are analyzed under the familiar *McDonnell Douglas* burden-shifting analysis."). Under the framework, a plaintiff must first establish a prima facie case of discrimination. *Auguster*, 249 F.3d at 402. The prima facie case, if established, raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, non-discriminatory reason for its action. *Faruki*, 123 F.3d at 319. If the employer meets its burden, then the presumption raised by the plaintiff's prima facie case disappears. *Id.* The plaintiff must then bear the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination. *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). To satisfy this burden, the plaintiff must produce substantial evidence that the employer's proffered reasons for its actions were a pretext for discrimination. *Id.*

Here, Mission contends that Lee cannot establish prima facie case of gender, race, or national origin discrimination. To establish a prima facie case, a plaintiff must "provid[e] evidence that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, shows that others similarly situated were treated more

---

[97] Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981; *Runyon v. McCrary*, 427 U.S. 160, 172 (1976) (Section "1981 relates primarily to racial discrimination in the making and enforcement of contracts." (internal quotation marks and citation omitted)).

favorably." *Okoye v. Univ. of Tex. Houston Health Sci. Cntr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (internal quotation marks and citation omitted). Summary judgment for the defendant is appropriate if the evidence demonstrates that the plaintiff cannot establish an element of her prima facie case, *see Faruki*, 123 F.3d at 319, or that the plaintiff cannot raise a genuine issue of material fact concerning pretext, *see id.* at 320.

## 1. Gender Discrimination

Lee, a female, satisfies the first element of the prima facie case. The parties do not dispute the second element. They also do not dispute the fourth element, as she was replaced with a male, Sergio Acevedo, following her resignation. The parties, however, dispute whether she has established the third element—*i.e.*, whether she suffered an adverse employment action. As mentioned, Mission claims that Lee voluntarily resigned from her employment, whereas Lee claims that Slaughter constructively discharged her by giving her the false choice to resign or be fired.[98] Therefore, as discussed in connection with the retaliation claim, there is a jury question on whether she suffered an adverse employment action. Further, as with the retaliation claim, Mission does not articulate a legitimate, non-discriminatory reason for its action: it says that because Mission denies taking an adverse employment action against Lee, it has does not have a reason to defend.[99] The Court therefore denies Mission's motion on Lee's gender discrimination claim.

---

[98] *Compare* Def.'s MSJ at 12, *with* Resp. to Def.'s MSJ at 13.

[99] Def.'s MSJ at 15.

## 2. *Race and National Origin Discrimination*

The parties do not dispute that Lee, a Hispanic, meets the first element of the prima facie case of race or national origin discrimination.[100] Further, as with the gender discrimination claim, the parties do not dispute that she meets the second element, but there is a fact question as to the third element, *i.e.*, whether she suffered an adverse employment action. Regarding the fourth element, Mission points out, and Lee does not dispute, that because Acevedo, who replaced her, is also a Hispanic, she cannot meet the "replaced by someone outside the protected class" prong.[101]

Recognizing this hurdle, Lee attempts to satisfy the fourth element under the "similarly situated" prong.[102] In support, she has submitted evidence that shows that Slaughter uttered various slurs and epithets pertaining to Mexicans, Mexican-Americans, and Hispanics.[103] She contends that this evidence is sufficient to show that her Hispanic race and Mexican national origin "factored into" Slaughter's decision to constructively discharge her and therefore, is sufficient to satisfy her burden of showing a prima facie case.[104]

To satisfy the "similarly situated" prong, Lee was required to show that "[s]he was treated *less favorably* because of h[er] membership in [her] protected class *than were other*

---

[100] For purposes of Title VII, some courts treat "Hispanic" as a race, others as a national origin. *Esquivel v. McCarthy*, No. 3:15-CV-1326-L, 2016 WL 6093327, at *7 (N.D. Tex. Oct. 18, 2016) (treating "Hispanic" as a race), *with Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston*, 837 F. Supp. 2d 635, 640 (S.D. Tex. 2011) ("Several courts have interpreted claims of discrimination based upon the plaintiff's status of being 'Hispanic' as being a national origin discrimination claim." (collecting cases)). Lee's complaint identifies her as a Hispanic woman only. Second Am. Compl. ¶ 12. Documents from the EEOC proceedings reflect that she is of Mexican origin. Def.'s MSJ, Ex. I.

[101] Def.'s MSJ at 14; Resp. to Def.'s MSJ at 14 (disputing only that Acevedo is a male).

[102] Resp. to Def.'s MSJ at 15.

[103] *Id.* at 15–17.

[104] *See* Resp. to Def.'s MSJ at 17.

*similarly situated employees* who were not members of the protected class, under nearly identical

circumstances." *Lee v. Kansas City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009) (emphasis added).

This prong thus requires a comparative showing[105] and thereby, "requires a Title VII claimant to

*identify* at least one coworker outside of h[er] protected class who was treated *more favorably*

under *nearly identical circumstances.*" *Alkhawaldeh*, 851 F.3d at 426 (emphasis added). This,

Lee has failed to do. Therefore, on this basis alone, Lee has failed to carry her summary

judgment burden. *See id.* at 426–27 (holding the employee's discrimination claim fails as a

matter of law because he "has failed to produce any evidence that he was treated less favorably

than others 'similarly situated' outside of his protected class."). In any event, the Court

construes Lee's argument as suggesting an alternative formulation of the fourth prima facie

element—*i.e.*, that she was otherwise forced to resign because of a protected characteristic.[106]

---

[105] *See, e.g., Jefferson v. Christus St. Joseph Hosp.*, 374 F. App'x 485, 491 (5th Cir. 2010) (*per curiam*) (prima facie case not made because the employer's policy was applied to the plaintiff as well as at least one non-minority and the record contained no information regarding the race or national origin of the supposed comparators), *cited in* Resp. to Def.'s MSJ at 9; *Turner v. Tex. Instruments, Inc.*, 555 F.2d 1251, 1255 (5th Cir. 1977) (prima facie case made out by the discharge of Turner, a black, for a timeclock infraction and the retention of a white employee after an identical violation), *overruled on other grounds by Burdine v. Tex. Dept. of Cmty. Affairs*, 647 F.2d 513, 514 n.3 (5th Cir. May 1981).

[106] The Court is mindful that "[t]he prima facie case is necessarily a flexible standard that must be adapted to the factual circumstances of the case," *Turner v. Kansas City S. Ry.*, 675 F.3d 887, 892 (5th Cir. 2012), and consequently, "there are various formulations of the [prima facie] test, most of which differ at the fourth element," *Heggemeier v. Caldwell Cty., Tex.*, 826 F.3d 861, 867 (5th Cir. 2016) (*per curiam*). "The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's [adverse employment injury]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981).

Here, although Lee cites the "similarly situated" prong, she ultimately argues that her Hispanic race and Mexican national origin "factored into" Slaughter's decision to constructively discharge her. *See* Resp. to Def.'s MSJ at 17. As an "ultimatum case," *Perret*, 770 F.3d at 339, this case presents additional wrinkles: Mission denies that it forced Lee to resign, and Lee's evidence does not satisfy the fourth prima facie element under the traditional formulation. In a case involving allegations of discriminatory termination because of race and national origin, the Fifth Circuit worded the fourth element somewhat differently from the traditional formulation: "(4) [the plaintiff] was treated less favorably than a similarly situated employee outside the protected class *or was otherwise terminated because of a protected characteristic.*" *Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 395 (5th Cir. 2012) (*per curiam*) (emphasis added). As Lee's ultimate argument more closely tracks the *Gibson* formulation and given the

Mission argues that the alleged comments by Slaughter do not pass the "stray remark" test and therefore are not sufficient evidence of discrimination.[107] At the prima facie stage, courts apply "a more flexible" standard to evaluate alleged discriminatory comments. *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015) (internal quotation marks and citation omitted).[108] To be relevant evidence, "the comments must show: '(1) discriminatory

---

circumstances of this case, the fourth prima facie element is adapted as follows: assuming that the plaintiff was forced to resign, she must produce sufficient evidence from which jury could reasonably conclude that she was otherwise forced to resign because of a protected characteristic. *See Murphy v. United Postal Serv., Inc.*, 986 F.2d 1424, 1993 WL 46826, at *2 (7th Cir. 1993) (unpublished table decision) (an ultimatum case) ("Ultimately, the plaintiff's evidence must show that he would not have been forced to resign but for his race."); *Devine v. Thalhimers*, 977 F. 2d 572, 1992 WL 296350, at *1 (4th Cir. 1992) (*per curiam*) (unpublished table decision) (an ultimatum case) ("To establish a prima facie case . . . , the plaintiff generally must show that . . . (4) there is some evidence that race was a determining factor in the employer's decision."); *see also Ortiz v. Shaw Grp., Inc.*, 250 F. App'x 603, 606 (5th Cir. 2007) (*per curiam*) ("To establish a prima facie case of intentional discrimination in a reduction-in-force case, a plaintiff must establish [that] . . . (4) there is sufficient evidence . . . from which a fact finder may reasonably conclude that the employer intended to discriminate in reaching the adverse employment action.").

[107] Reply to Def.'s MSJ at 10.

[108] By "more flexible," the *Goudeau* panel distinguished the standard set forth in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996), for evaluating whether comments constitute "stray remarks," which, standing alone, are insufficient to defeat summary judgment. Here, the parties rely on the *CSC Logic* standard, which provides, in the context of age discrimination, that: "Remarks may serve as sufficient evidence of age discrimination if the offered comments are: 1) age related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *CSC Logic, Inc.*, 82 F.3d at 655; *but see Laxton v. Gap, Inc.*, 333 F.3d 572, 583 n.4 (5th Cir. 2003) (noting that, in light of the Supreme Court's decision in *Reeves*, 530 U.S. 133, the *CSC Logic* test applies only when a remark is presented as direct evidence of discrimination). The *Goudeau* panel stated: "That more demanding test applies, however, only when the remarks are being used as direct evidence of discrimination. Such a case is analyzed outside the more common *McDonnell Douglas* framework, as the comments are being relied on to prove the entire case of discrimination." *Goudeau*, 793 F.3d at 475 (internal citation omitted).

In *Goudeau*, which involved age discrimination under the Age Discrimination in Employment Act (ADEA), the court applied the more flexible standard because the plaintiff "contend[ed] that the ageist comments satisfy the fourth prima facie element—that he was *otherwise discharged because of* his age.'" *Id.* (emphasis added). Here, the Court applies the same standard for purposes of the prima facie case. *See Faruki*, 123 F.3d at 318–19 (observing that the fourth prima facie case element for the ADEA and Title VII discrimination claims are "similar, although [they are] worded . . . somewhat differently").

animus (2) on the part of a person that is . . . primarily responsible for the challenged employment action . . . .'" *Id.* at 475–76 (internal quotation marks and citation omitted).

According to Lee's evidence, on one occasion during her first term of employment, when Tony Duran, a sales manager at Mission, was walking with a team of salespersons, Slaughter said: "Hey, Tony, where are you taking all those Mexicans, to a bullfight?"[109] On another, when a group of salespersons were standing around, Slaughter said: "Get those Mexican cholos to work."[110] Lagos states that Slaughter used "spics" and "wetbacks," when making jokes about Hispanics and Mexican-Americans.[111]

There is, however, no evidence that Slaughter ever used them to refer to Lee. Nor has Lee produced other evidence in support of her claim that her race and national origin factored into Slaughter's decision to force her to resign. *Cf. Goudeau*, 793 F.3d at 476 (noting that "the comments are not the only evidence [the plaintiff] can point to in support of showing that he was discharged because of age," and considering additional evidence); *see id.* at 475 ("[T]he discriminatory remarks are just one ingredient in the overall evidentiary mix.").

To the contrary, the undisputed record evidence undercuts Lee's claim that Slaughter forced her to resign because of her Hispanic race or Mexican origin. During her first term of employment, her pay steadily increased from $25,000 (when she was hired in April 2009) to $45,000 (when she resigned in October 2012).[112] In May 2013, when she re-applied for

---

[109] Lee Dep. at 62:12–23.

[110] *Id.* at 63:24–64:25.

[111] Lagos Aff. ¶ 8.

[112] Resp. to Def.'s Undisputed Facts at 2–3.

employment at Mission, Slaughter authorized her re-hire.[113] Within five or six months thereafter, she was promoted to a management position.[114] At the time, there were five managers in her department, four of whom were Hispanic.[115] When she was allegedly forced to resign in March 2014, more than 90% of Mission's workforce, which included approximately 140 individuals, and the General Sales Manager were Hispanic.[116]

From this evidence, no reasonable jury could conclude that Slaughter forced her to resign because of her race or national origin. Accordingly, the Court grants Mission's motion for summary judgment on Lee's race discrimination claims under Title VII and § 1981, and her national origin discrimination claim under Title VII.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Plaintiff Lee C. Lee's "Motion for Partial Summary Judgment and Memorandum in Support" (ECF No. 15) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Mission Chevrolet, Ltd.'s "Motion for Summary Judgment" (ECF No. 16) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the motion is **GRANTED** as to Plaintiff's Title VII claims for Hostile Work Environment based on race and national origin; Title VII claims for race and national origin discrimination; and § 1981 claim for race discrimination; these claims are **HEREBY DISMISSED**. The motion is **DENIED** as to all other respects.

---

[113] *Id.* at 3.

[114] *Id.* at 3.

[115] *Id.* at 4.

[116] *Id.* at 2.

So ORDERED and SIGNED this 23<sup>ard</sup> day of October 2017.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE